Morning, ladies and gentlemen. First case for argument Levin versus Verizon, Mr. Bernardino. Good morning, Judge Posner, Judge Eastbrook, Judge Sykes. For the record, I'm Colin Bernardino of the firm Kilpatrick, Townsend & Stockton, and I'm appearing on behalf of Elliot D. Levin, the Chapter 7 trustee for One Star Long Distance, Inc., the appellant and cross appellee in these cases. May it please the court. Counsel. This is an appeal from the affirmance by the United States District Court for the Southern District of Indiana of a final judgment by the United States Bankruptcy Court for the Southern District of Indiana holding that payments from One Star Long Distance to MCI could not have been avoided as a result due to MCI's subsequent new value defense. On December 31, 2003, three creditors of One Star had filed an involuntary petition for bankruptcy against One Star, and One Star had been a reseller of telecommunications services, purchasing wholesale telecommunications services from providers such as Verizon and MCI and reselling them to retail customers. And during the 90 days prior to the filing of the petition, MCI received $1.9 million in overdue services from providers to MCI, including $571,000 due on notes made in conjunction with payments under payment plans for long overdue services, and $1.9 million for invoices of more recent services. During October, November, and a portion of December of 2003, MCI had supplied telecommunications services to One Star under various services agreements. But on December 22, 2003, One Star MCI and ICENET, an affiliate of One Star, entered into an assignment and assumption agreement, which provided, among other things, that One Star waived its rights to receive further telecommunications services from MCI, and that all pre-assignment obligations... Where does your argument leave the creditors... Excuse me, Your Honor? Oh, you're arguing for the trustee. You're arguing for the... Sorry, I confused you with your opponent. Your Honor, and it is stipulated that the $1.9 million in payments on accounts did prefer MCI as opposed to the other creditors. That has been stipulated. So Section... All of the prima facie elements of 547B were met. That is not in dispute. So, as a result of the payments, MCI was paid 100 cents on the dollar of the invoices that were paid by those preferential payments. As it stands right now, general unsecured creditors are receiving zero dividend. As a result, though, of the assumption and assignment agreement, MCI ceased providing services to One Star and began to provide services to ICENET, One Star's affiliate. ICENET, primarily controlled by One Star's officers, resold those services to One Star at a markup that had been found to be up to 77.2 percent, well in excess of the industry average markup of 10 to 12 percent. That was found by the One Star examiner previously in the One Star case. The CHAP 7 trustee had filed this adversary proceeding to avoid and recover these payments because of the preferential effect that we discussed. The subsequent new value defense was raised by MCI on account of the services that they provided during October, November, and December prior to the assignment agreement, and the lower courts have found that that was a complete defense. The trustee disputes this. The new value was paid by the entry into the assignment agreement. As a result of the assignment agreement, One Star released any claims that it had against MCI to receive further services under the telecommunications services agreements that were then in effect, giving up a valuable right that the estate had. MCI was able to go and purchase services from other parties, including ICENET, at a substantial markup, thereby detrimentally affecting the One Star estate. Additionally, MCI acknowledged that it was no longer owed any funds as a result of the assignment agreement. Furthermore, the lower courts erred when they found that a per diem average could be used to determine how much on any particular day was provided in new value services. At one point, there were records showing a daily provision of services. Those records were lost at some point, and so the lower courts just simply took an average and said, well, after the December payments totaling $300,000, we will just apply an average because that's the best that we have. We believe that was inappropriate given the fact that, among other things, MCI at one point had the ability to determine that, and it was MCI's burden to prove that. They did not meet that burden of proof. Furthermore, Your Honor, we believe that the ordinary course defense, which is subject of cross-appeal, was properly found to not be of dealings leading up to One Star's filing. Before you move to the ordinary course defense, the subsequent value defense and your argument with respect to the extinguishment of the debt, my understanding is that it was not, in fact, extinguished. It was transferred and still owed. That One Star was still liable for the debt just to ICENET, so it was a pass-through, essentially. Yes, ICENET did have now the right to assert or demand payment on the obligations. The agreement provides that ICENET would take a new assignment of MCI's obligations. All obligations would be secured under the terms of the assignment agreement. But MCI itself acknowledged that vis-à-vis One Star, MCI could no longer demand payment. That's where I have trouble, is in the word effectively. Because, of course, Verizon didn't get a penny as a result of this transfer. So why does one treat non-payment as payment? Well, Your Honor, as a result of entering into this transaction, the estate was made worse off. Maybe the trustee could seek to undo that transaction. But your argument is that this transfer is the same as payment. And my question is why, for the purpose of 547C4, non-payment would ever be treated as payment? Well, Your Honor, the subcommittee value defense is supposed to encourage continued dealings between the parties. And here that did not happen. MCI was effectively walking away and subjecting One Star to a worse treatment, 77.2% markup by an affiliate. That was only for the last week of the preference period. There had been substantial extensions of service that remained unpaid during October, November, and the first three weeks of December. That is correct, Your Honor. However, the parties had no way of knowing when, in fact, bankruptcy was going, an involuntary petition was going to be filed. So if it had happened in January or February, we still would have been dealt with this issue and it would have been a longer period of time. It just so happens that it occurred nine days prior to the involuntary petition being filed. Well, right, but the fight is about all the services that were provided during October, November, and the first three weeks of December that remained unpaid and whether that offsets the preferential payments that were made during that period. Yes. And they substantially offset. Your Honor, no determination was made as to the value that was, you know, what the value of the payment. Here clearly there must have been some value, otherwise MCI would not have required One Star to enter into this transaction. One Star could have gone through the procedures to terminate under the various services agreement. It chose not to. It chose to have One Star assign its rights that provided that MCI must provide services under the various telecommunications services agreement. Here MCI was apparently losing money under this contract and wanted to get out of it. That was worth something to MCI to go ahead and assign those contract rights or have One Star assign those contract rights to ICENET. But for that assignment, MCI would have continued to have been exposed to further credit risk. And clearly just the simple fact that MCI required One Star to do this means that it was worth something to MCI. The dollar amount, the trustee would contend, you know, that it paid all of the obligations that were covered under this contract. However, that finding was not made and that would be something that would have been MCI's burden to show. What payment are you referring to? I'm referring to the release of One Star's rights. A release has been found to be a payment. Payment can be a discharge of an obligation in money or its equivalent. Well, it was a release of the right to receive telecommunications services. It wasn't a discharge of the debt, the preexisting debt. Well, this whole transaction arises out of the services agreements and the amounts that it erodes. So if there was a payment made, it must have been made on the obligations that preexisted at the time. But it wasn't made, it wasn't a quid pro quo for a discharge of the debt.  It actually served two disconnection notices. But yet it had not disconnected at the time and so presumably was continuing to provide services. It could have just disconnected. The fact that it chose not to suggests that there was some value to MCI that was being offered. So does your case come down to trying to get back, what, $1,900,000 from MCI in order to give to the unsecured creditors? Yes, Your Honor. That's what it amounts to? If the $1.9 million of payments are avoided, then those would be recovered under Section 550 of the Bankruptcy Code. And then that distribution would be made according to the priority scheme of Chapter 7. Now what about your second issue, the $200,000? What is that about? I believe Your Honor is referring to the per diem, the lower court's determination that a per diem average was an appropriate way to determine how much... Is this about your compensation? $200,000? No, Your Honor. I don't believe that our compensation was at issue in this affair. Who gets the $200,000 if you prevail? Your Honor, there were two payments, or payments totaling, they were made in bunches, but payments totaling an aggregate $300,000 in December. One group of payments was for $100,000 and one was for $200,000 on December 9th and December 17th of 2003. There were five days of services. Payments to whom? Payments from OneStar to MCI. So OneStar was continuing to make payments under the payment plans and open accounts. And so $300,000 in December of 2003 was made to MCI by OneStar. The question, the trustee believes that the lower court's... So that's a separate amount that you want back? No, that would be included in the $1.9 million. The $200,000 is part of the $1.9? It's $300,000, Your Honor. $300,000? Yes, that's included in the $1.9. If the court were to determine that the releases, the assignment agreement did not pay the new value, the trustee contends that still $300,000 should be avoided and recovered. That would be the $300,000 that were paid in December of 2003 because no new value was shown to have been provided after those payments. The lower courts used a per diem determination to say, well, there was $1.7 million of new value provided in December. We don't know when it was provided. It could have been provided at the beginning of the month. It could have been provided between December 17th and December 22nd. No one knows. There was no evidence conclusively shown. The courts just said we'll take the average. We believe that it's inappropriate here where the evidence had at one point existed but had been lost by MCI. It was their burden to show how much new value they provided after those two sets of payments, and as a result, that even if new value did not remain... What's theoretically wrong with the per diem approach? Well, in this instance, we don't know what services were being provided. We know that services were provided during the course of the entire month. We don't know that, Your Honor. We know that we have an invoice that says for December there was an amount provided. It doesn't say on December 31st here are all of the calls that were made. Right, but some of the charges were fixed and others were variable, and those that were variable were provided continuously on a call-by-call basis apparently, and those services, it can reasonably be assumed, were provided throughout the course of the entire month, and so the per diem method of taking the monthly total and dividing it by 31 days is a reasonable way to measure. Your Honor, at the time this adversary proceeding was filed, such evidence existed to show exactly how much would have been provided on a particular day. There were call logs. Yes, some of it was fixed, and so one might extrapolate that and say, okay, the fixed charges are for a particular period of time. However, no one knows how much the variable services were on any particular date today or at the time of the trial. Okay, I'm not hearing a real theoretical objection to using this methodology. It sounds like you're just arguing that because the evidence once existed to provide an actual amount, MCI should be foreclosed from using this per diem method? Is that what your argument is? I think that would be a reasonable result, but also we don't know how much the variable amounts were on any particular date. Well, right. That's why the lower courts used the per diem method, but that's just a statement of the obvious. You're not really objecting to this method as a theoretical matter. It's perfectly valid. It's just you don't think MCI should get the benefit of it because it didn't preserve the right records? I'm trying to pin down what your argument is. Well, I think that is an argument that, yes, we are making, but also we don't know on, say, December 2nd how much was provided versus on December 17th or 18th. Right. That's just a statement of the obvious. That's why the lower courts used the per diem method of calculating, which is a perfectly reasonable way, and I don't hear you objecting to that in theory. Okay, we have to move on.  I'll give you a minute, lady. So, Mr. Carter. Good morning. Mark Carter for Verizon Business Global. On the assignment for the contract, which the court's gone over to some degree with respect to the terms of it, I think the court's grasped our argument, which is the statute requires a transfer of property from the debtor to the creditor, and there's no allegation whatsoever that any property interest was transferred. So on the face of it, I think their argument fails right there. They make some machinations about what effect it might have had on MCI from transferring and substituting the parties, which is all that really happened, that ICENET bought the debt and acquired the services agreement, which it then resold to OneStar. So OneStar's operations really weren't materially affected. There was no payment of any kind to MCI. All this was was an assignment of debt. So now the debt was held by someone else, but there was no payment. Well, what about these unsecured creditors? The effect on them? Don't get anything, or what? Well, we'll see how the case has been going for 12 years through this and a variety of other adversary proceedings brought against the primary. I'm sorry, I can't hear you. Yeah, the arguments have gone on for 12 years. Primarily there was lawsuits against the insiders who pilfered a lot of money from the state, and then the last proceeding was brought against the unrelated party, which was MCI acquired later by Verizon. So the outcome will be based on what other assets have been recovered in the case. The trustee reports, which I don't think are part of the record, indicate that the administrative claims will consume a large part of this, which is primarily the attorney's fees that were incurred over a decade of various litigation. But in direct response to the question, MCI gave more than $2.5 million to the state in the preference period because its debt at the time of the 90 days preceding the commencement of the bankruptcy case. So what happened to that money? Apparently it wasn't given to these unsecured creditors? Well, it was. That service credit was extended to the service credit for the operations provided by MCI as the supplier of telecommunications services. Well, what MCI did for OneStar, did anything that it did contribute to the claims of the unsecured creditors? It contributed property that created the estate from which the creditors could be paid by an amount exceeding $2.5 million. So have the unsecured creditors gotten anything? To my knowledge, the trustee operates the estate, but not yet. But the case has not been closed yet. But I think the point to make in response to the inquiry. Wait, I'm sorry. I'm having trouble hearing. What is the situation of the unsecured creditors? In the overall estate, which has a variety of claims against it and claims it's recovering against third parties, that remains to be resolved because the case is still open. But the important thing for this adversary proceeding is, were those creditors benefited or harmed by the actions taken in this 90-day period between Verizon and the debtor? And they clearly benefited the estate and, therefore, the creditors by the sum of $2.5 million. How did it benefit them? Pardon me? How did it benefit them? Because the amount of credit advanced by MCI to the debtor in the 90 days preceding the filing of the bankruptcy, which is the relevant period, was $2.5 million greater than the payments that were made back. So the debt that was owed to Verizon actually increased by $2.5 million, which is contrary to the policy that the preference action was set up to undo. Okay, so what happened to this money that went back to OneStar? So OneStar then had to … It has these creditors. So what did OneStar do with the money? Oddly enough, Verizon, since it was a preexisting creditor, ironically since Verizon was a preexisting creditor from its own business dealings with the debtor, also has a claim. But the importance is that the estate from which the creditors were going to be paid and will be paid was enhanced rather than diminished by the interaction between Verizon and the debtor. The debtor prospered by this. But these unsecured creditors haven't been paid. You say they will be paid? That depends on the totality of other claims against the estate and other assets recovered, so I can't tell the court one way or the other. So you're saying the bankruptcy proceeding just isn't over? No, it's still pending. I see. For a very long period of time, and that's why a large amount of this will actually go to the administrative creditors if there was to be a recovery because those are primarily professionals that rendered services during the case. So even if this was to be recovered, I don't know that there could be a promise that unsecured creditors would still receive anything. It would be greater. But the important part is the preference statute was passed so that a creditor wouldn't receive a disproportionate share of the assets and therefore deprive the distribution to unsecured creditors. And what happened here is precisely the opposite. Verizon gave more than it got. And that's the purpose of 547C's exception, recognizing the new value, because it's to incentivize a creditor like Verizon to continue to advance unsecured credit, to give that debtor a chance to avoid bankruptcy, which would otherwise arise from a liquidity concern if creditors say, well, I'll have to give back any payments. I'm not going to advance any more credit. And if we went through the provisions of the assignment, which was discussed in a summary fashion, they're very clear that there's only a transfer of a contract right from the debtor to OneStar, and there's a transfer of debt from Verizon to ISNET. So ISNET is the one that changed its position. MCI received no payment, and OneStar gave up nothing. It just changed who it was going to get its supply of services from. Rather than directly from MCI, it then received it indirectly through an intermediate ISNET. So the assignment simply has no relevance to the application of 547C2B, which is the limitation on the exception arising from a payment on account of new value. On the per diem piece, I think the issue that was raised there is, will monthly billers simply be consigned to losing any type of new value defense because they would never be able to establish what they receive on a day-to-day basis by the virtue of their billing? And there's been some statement about what records existed at the time of the bankruptcy in 2003. I don't know. Verizon acquired this company, I believe, in 2006 and had the records such as they were. Those records would have had raw data on calls, but there's no evidence that contained all the evidence necessary to establish what the value was that would be applied in this context to determine the extent of the defense. So there's no evidence in the record to say that changed what our outcome is today. The trustees raised a couple of legal authorities that were rejected below, and that's the U.S. Interactive case. That was a single transaction, so it was not a monthly billing case. So in our view, it has no application to this case, as the district court also determined. And we cited three cases that did involve monthly billing, all of which sustained the per diem method, which was Brooks-Mays Music, FERS Supermarkets, and Lisa Fleet. And I'm not aware of any case to the contrary that rejects the per diem use. I'll make just a short comment about the ordinary course defense because it's only relevant should there be any change in the affirmance of the total defense of the new value. And that's simply there was no testimony offered by the trustee to controvert the evidence on the three prongs of the ordinary course defense. All the dealings stayed the same. There was no change. There was evidence offered about the industry practice, and it conformed to ours. And we had a variety of payments that were paid within the invoice terms, which as a matter of law should be ordinary course. So that should be affirmed simply as a matter of law. So on that basis, we ask that the judgment of the district court be affirmed. Thank you. Thank you, Mr. Carter. So, Mr. Bernardine, you can have another minute or two. I know your time expired. Thank you, Your Honor. Two points. So your opponent's main argument is that the bankruptcy is going on and all these issues will be resolved in due course? Your Honor, I'm not sure I follow the case. The bankruptcy case is still open. This adversary proceeding has to be resolved before the case can be closed, as well as there would be determinations on claims that have been filed in the case as well. To clarify a point by my opponent, to my understanding there are no administrative claims that are currently outstanding in the case. There are no administrative expense priority claims that are unpaid right now in the case. Chapter 11 administrative claims were paid in full, and I believe Chapter 7 administrative expenses have been paid to date as well. But you have these unsecured creditors you're worried about. Yes, Your Honor. Do you? Yes, yes. If the trustee is able to recover on this proceeding and perhaps through claims reconciliation. Well, Mr. Carter is saying that it's too early to tell that MCI did confer value on one star and how much of that value remains for these unsecured creditors will be decided by the bankruptcy court. Your Honor, the distribution to general unsecured creditors, the amount of the dividend is not known right now. That will have to be determined as a result of this adversary proceeding, as well as any other claims reconciliation that might occur. If the trustee were successful, if the lower courts were reversed, the trustee was able to recover the $1.9 million, I expect that there would be a distribution to general unsecured creditors. Or in addition to, I believe there are some priority tax claims that remain unpaid as well. And does your case turn on whether MCI contributed real value to one star or ISNA? Your Honor, we don't dispute that new value was provided through the services under the telecommunications services agreements. The trustee disputes whether those services remained unpaid, which is the rule under the Prescott decision and also followed in the P.A. Bergner decision. Those require that new value remain unsecured and remain unpaid. Okay. Well, thank you very much to both counsel. Thank you, Your Honor.